EDITH H. JONES, Chief Judge,
dissenting:
With due respect, I dissent from the majority’s decision to grant habeas corpus relief on the basis of ineffective assistance of trial counsel. AEDPA mandates that *913 we apply a “doubly deferential judicial review” to ineffectiveness claims. Knowles v. Mirzayance, — U.S. -, 129 S.Ct. 1411, 1420, 173 L.Ed.2d 251 (2009). The majority, in effect, hold otherwise.
This is not a case where exculpatory evidence was concealed from the jury or where counsel failed to uncover evidence that could have assisted the defense. This was a fully and carefully tried case featuring many eyewitnesses to the crimes and virtually no disagreement on the facts of what the defendant did. The question of White’s intent to murder was hotly contested, but the jury verdict is well supported by the evidence.
The majority focus on counsel’s two alleged trial errors and conclude that because of these errors, the verdict is so unreliable as to render the Texas courts’ decision “objectively unreasonable” in applying Strickland. The majority, in my view, commit three mistakes. First, the majority offer a version of the trial record that minimizes the strong evidence against White. Second, to find trial error, the majority place themselves in the position of a Texas appellate court and rule questionably on issues of Texas evidentiary law. Finally, the majority’s prejudice evaluation turns on the unduly constrained factual summary. The upshot of these errors is to thwart the deference that we owe to the state court procedures. As this court has recognized, “ ‘[t]he question under AEDPA is not whether a federal court believes the state court’s determination was incorrect but whether that determination was unreasonable' — a substantially higher threshold.’ ” Richards v. Quarterman, 566 F.3d 553, 561 (5th Cir.2009) (quoting Schriro v. Landrigan, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007)). Richards also noted that, “ ‘because the Strickland standard ... is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.’ ” Richards, id. (quoting Knowles v. Mirzayance, 129 S.Ct. at 1420).
1. The Facts
The majority describe how Tracey Johnson’s barroom dispute with White escalated over several hours, culminating in White’s groping her just as Koach’s Bar closed. White left the bar and got into his truck, which was parked in front of a restaurant in the strip center where the bar was located. A friend of Tracey’s punched White and bloodied him, but Tracey and her friend walked away.
Five eyewitnesses testified to what ensued.
White started his truck, and it shot forward and hit a planter in front of the restaurant. Then he backed up. White paused before his next move. A witness saw him wearing his eyeglasses. That witness testified that White had not seemed drunk that evening.
The majority omit to mention that White had a choice at this point. He could have turned right, out of the parking lot and directly into the street, freeing himself from the “dangerous” crowd. But he did not make that choice. Instead, he turned left and headed toward the front door of Koach’s and straight toward Tracey. A mere thirty feet separated him from Tracey. These five eyewitnesses all testified that White had the time and space to have avoided hitting her, and there were other ways he could have left the parking lot. All five eyewitnesses concluded his acts were intentional.
After White knocked Tracey under his truck, a crowd gathered and began pounding on the truck and yelling at him to stop. Latasha Vasquez climbed on the hood and banged it, in an effort to save her friend. *914 Again, White had a choice. He abruptly moved back and forth several times. Vasquez was knocked down and under the truck. She was run over three times, Tracey at least two. One witness likened the truck’s motion in driving over the bodies to crossing a speed bump.
When White left the scene and drove home, two witnesses tailed him. They testified that he was speeding, maneuvered around traffic, and turned a number of corners in his subdivision before arriving home. Evidently, his vision was unimpaired for those purposes.
The coroner described Vasquez’s broken body. Much of her skin had been scraped off by abrasive contact with the pavement and truck tires. Nearly all her ribs were crushed, her pelvic and femur bones broken, and her heart ruptured. She had deep bruises on her back and legs. That she was pregnant merely added to an already horrific description.
These are the facts supporting the jury verdict of murder and against which we must measure the impact of counsel’s alleged errors and the reasonableness of the state court’s decision.
2. Counsel’s Evidentiary Errors
The Texas Court of Criminal Appeals declined to decide whether White’s attorneys, Mr. and Mrs. Mingledorff, were ineffective because they (a) failed to object, and indeed opened the door, to cross-examination about their client’s “post-arrest silence,” and (b) failed to object, and commented on, the coroner’s evidence that Latasha Vasquez was pregnant. No doubt, the majority felt obliged to rule on these points to set the stage for Strickland’s prejudice component. Prejudice arises for habeas purposes only as a-result of errors by trial counsel. Strickland, 466 U.S. 668, 684-85, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674. It is dubious, however, that counsel, both of whom have decades of experience in criminal law, made the mistakes now attributed to them.
First, it is not clear under Texas law that White could not be examined about his post-arrest conduct. In its case in chief, the prosecution offered the testimony of Officer Cibulski, who transported White from his home back to Koach’s for identification by the witnesses. Cibulski said that White told him “he didn’t know that was going on, that he had been sleeping in his house all night long when the Fort Bend County deputies pulled him out of the house.” Detective Bob King reported White’s sarcastic response to routine questions about his height and weight; White answered that he was ten feet, six inches tall and weighed 443 pounds and 6 ounces. Thus, White was not “silent” while in police custody. At trial, White had to deny his statement to Officer Cibulski in order to support the defense strategy that he was the victim of an angry mob.
These facts distinguish White’s case from Sanchez, on which the majority rely. Sanchez held that the “rules relating to impeachment prohibit the use of [post-arrest silence] since [such conduct] is not probative as prior inconsistent conduct.” Sanchez v. State, 707 S.W.2d 575, 578 (Tex.Crim.App.1986). In Sanchez, the defendant never said anything to police following his arrest, which occurred two years after the killing for which he was charged. At trial, however, when he attempted to claim self-defense, the prosecutor cross-examined him about his failure to speak up at the time of his arrest. Here, White did speak up contemporaneously. Defense counsel “opened the door” to cross-examination in an effort to distance White from his own post-arrest speech. Sanchez therefore does not directly control this case. Indeed, a Texas court found that no Sanchez violation occurred under some *915 what similar circumstances. Lum v. State, 903 S.W.2d 365, 369 (Tex.Ct.App.1995) (cross-examination of defendant that elicited a different story about his post-arrest conduct from what he testified to on direct examination was “proper to refute the false impression Lum gave in his testimony”). In White’s habeas appeal, two justices of the Texas Court of Criminal Appeals separately concurred to make clear that, though the court did not consider trial counsel’s alleged deficiency, Sanchez did not control. Ex parte White, 160 S.W.3d 46, 56 (Tex.Crim.App.2004) (Keller, P.J., concurring). Thus, I cannot agree with the majority’s certainty that counsel erred. Their actions were necessary to pursue their defensive strategy.
Further, even a successful objection to cross-examination of White’s “post-arrest silence” would not have gained much, because White’s credibility was already compromised. His statement to Officer Cibulski directly contradicted the story he told his wife that very evening and his later testimony.
Ms. Vasquez’s pregnancy raises another issue of Texas evidence law that the majority strain to portray as error. As the majority acknowledge, Texas has long held that the damage inflicted on a victim by her assailant, including the death of a child in her womb, is admissible at trial.[1] The majority distinguish older, on-point cases because they predate the Texas rules of evidence. See, e.g., Washington v. Texas, 46 Tex.Crim. 184, 79 S.W. 811, 814 (Tex.Crim.App.1904); Mosby v. Texas, 482 S.W.2d 256, 258 (Tex.Crim.App.1972). Respectfully, it is difficult to understand how pregnancy, unlike any other evidence of bodily condition uncovered in an autopsy, is “irrelevant” such that it is inadmissible under Rules 401 and 402 of the Texas Rules of Evidence. Indeed, Texas law is explicitly to the contrary. See Reese v. Texas, 33 S.W.3d 238, 239-40 (Tex.Crim.App.2000) (finding relevant the fact “that a pregnant woman died” as demonstrating the “results” of the defendant’s actions); Erazo v. Texas, 144 S.W.3d 487, 493 (Tex.Crim.App.2004) (“It is true that the death of the fetus was a relevant part of the circumstances of the offense [murder].”); Gipson v. Texas, No. 01-03-00581-CR, 2004 WL 1065428, at *2 (Tex.App.-Houston 2004) (unpublished) (writ denied) (stating that there is “no precedent holding that evidence of a victim’s pregnancy is categorically inadmissible” and that the fact of pregnancy was “relevant in describing the nature of the offense [aggravated robbery] to the jury.”). Nor was this evidence unduly prejudicial, a question that the majority decline to reach. Any number of bodily conditions — e.g., being in a wheelchair, elderliness, blindness, terminal illness — might arouse jurors’ sympathy. Thus, in a murder case, a Texas court held undue prejudice arose not from the fact of the victim’s pregnancy but only from an inflammatory color photograph of the victim and her unborn child lying together in a casket. Reese, 33 S.W.3d at 242-43. Under Texas law, the fact of Vasquez’s pregnancy was not clearly inadmissible. Failure to object to its admission was not error and created no Strickland deficiency.
3. Prejudice
The majority speculate that the prejudice arising from Vasquez’s pregnancy, *916 coupled with the prosecutor’s cross-examination of White’s “post-arrest silence,” tipped the scales to a verdict of intentional murder. All one can say is that the majority’s speculation is no more informed than that of the unanimous Texas Court of Criminal Appeals. We know that the jury was not unduly prejudiced with regard to Tracey Johnson by the cross-examination of White’s “post-arrest silence”; the jury convicted White of aggravated assault rather than attempted murder of Tracey. My speculation, which is as good as the majority’s, is that Ms. Vasquez’s pregnancy was no more compelling to the jury than the -testimony that White’s truck bumped up and down over her chest three times and crushed it as if it were a beanbag.
My further speculation is that, to the extent there is uncertainty about the reliability of a murder verdict, White made his bed tactically and ought to lie in it. Not only did White object when the State requested a lesser-included offense instruction of aggravated assault against Tracey Johnson, but he refused to allow a lesser-included offense instruction in regard to Ms. Vasquez’s' death. In these decisions, White and his counsel selected an all-or-nothing strategy, and the evidence fully supports the jury’s verdict.
The Supreme Court has repeatedly admonished that “it is not enough to convince a federal habeas court that, in its independent judgment, the state court decision applied Strickland incorrectly.” Woodford v. Visciotti, 537 U.S. 19, 27, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (quoting Bell v. Cone, 535 U.S. 685, 699, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002)). According to the Supreme Court, the state court’s decision in Woodford, while “perhaps” incorrect, was not objectively unreasonable, given the strength of the aggravating evidence. Id. at 27, 123 S.Ct. at 361. The issue in this case was whether White intentionally ran over Ms. Vasquez. The Texas Court of Criminal Appeals identified the correct legal standard and referred to it consistently and appropriately throughout its opinion. Based on its review of the evidence, the court concluded there was not a reasonable probability that the outcome of the case would have been different if counsel had not committed the alleged errors and that White was therefore not prejudiced. Even if this ultimate conclusion was incorrect, it was not, under the “doubly deferential” standard applied to ineffective claims in a habeas proceeding, Knowles, supra, objectively unreasonable.
I respectfully dissent.[2]

. Under Texas law, a person commits murder when he "intentionally or knowingly causes the death of an individual” or "intends to cause serious bodily injury and commits an act clearly dangerous to human life...." Texas Penal Code § 19.02 (emphasis added). Loss of a fetus is a serious bodily injury under Texas law. St. Clair v. Texas, 26 S.W.3d 89, 100 (Tex.App.2000); Edinburg Hospital Authority v. Trevino, 941 S.W.2d 76, 79 (Tex. 1997).

. While I concur in the conclusion that Article III of the Constitution was not violated when the parties consented to proceed in this federal habeas action before a United States Magistrate Judge, this result is somewhat troubling. When federal courts exercise our habeas corpus jurisdiction to overturn the decisions of a state’s highest court, we directly interfere with state sovereignty. Article III judges should assume ultimate responsibility for deciding these consequential cases, although they may choose to accept a report and recommendation from a magistrate judge. I am especially troubled, however, by the frequent resort to magistrate judges in death penalty cases, which represent both a potential interference with state courts' most significant criminal cases as well as vindication of the petitioners’ most significant rights.